**In the United States District Court**
**For the Eastern District of Texas**
**Sherman Division**

| | | |
|---|---|---|
| Anchor Graphics, Inc.,<br>*Plaintiff*,<br><br>v.<br><br>Summit Graphics, LLC;<br>Eric S. Brown, Jr.;<br>Andrew Johnson;<br>Keidric Smith;<br>Tammy Mitchell;<br>Benjamin Mercer;<br>Christian Mitchell; and<br>Brandi Eversole,<br>*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | <br><br><br>Civil Action No. ____________________<br><br>Jury Trial Demanded |

## Complaint

Before Anchor Graphics, Inc. had even finished moving its operations from its longtime Pilot Point facility, a competing printing company was already taking shape around the people, customers, and confidential know-how that had made Anchor's business successful. Summit Graphics, LLC began operating from Anchor's former location, staffed itself with a collection of former Anchor and JAL employees, and set about competing for the same labels, packaging, and signage business.

The documentary record shows how Summit intended to do it. Former Anchor employees carried with them—and, in some instances, deliberately transferred—Anchor's internal pricing tools, customer and prospective-customer information, vendor relationships, product specifications, production requirements, and accumulated manufacturing know-how. They then used that information to help Summit quote work, develop suppliers, and pursue business that Anchor had spent years learning how to win and perform. This action seeks to stop Defendants from using Anchor's own confidential information, trade secrets, customer relationships, and contractual protections as the blueprint for building a competing business against it.

## I.
## Introduction

1. Anchor has spent decades developing the customer-specific specifications, pricing methods, vendor relationships, production solutions, and accumulated know-how required to manufacture specialized labels, packaging, signs, and related products. That information gives Anchor a competitive advantage because a rival possessing it can quote and service Anchor's accounts without undertaking the same years-long process of testing, trial and error, customer feedback, rejected products, and relationship development.

2. Summit did not build its knowledge base independently. Eric Brown and Andrew Johnson, two former senior executives within Anchor's former corporate group, established and operated Summit as a direct competitor from the same Pilot Point, Texas facility that Anchor had just vacated. Summit then assembled a substantial portion of Anchor's former workforce, including Keidric Smith, Tammy Mitchell, Benjamin Mercer, Christian Mitchell, and Brandi Eversole.

3. Those five former employees were subject to written protective agreements that permit lawful competition but prohibit misuse of protected information, solicitation of covered customers and employees, and other interference with Anchor's relationships. Their agreements also require the return of Company information and survive termination.

4. Summit's competitive effort depends on Anchor-derived information. Eric Brown directed Keidric Smith and Christian Mitchell to provide the label materials, vendors, and vendor contacts needed for Summit to quote work. Keidric Smith responded by disclosing nonpublic Anchor information concerning customer requirements, material selections, vendor relationships, production methods, and negative know-how. Benjamin Mercer and Christian Mitchell participated in and received the same communications, while Johnson participated in Summit's

earlier transmission of spreadsheets and specification sheets to the outside supplier assisting Summit's quote effort.

5. Tammy Mitchell engaged in an equally deliberate course of conduct. In the final days before she left Anchor, she repeatedly accessed Anchor's computer systems and transferred Anchor files to her personal iCloud account. The materials included Anchor's internal custom-label costing and pricing workbook, a material-cost database, labor and production assumptions, customer artwork and production files, pricing information, a file identified as "NEW MONTHLY CUSTOMERS," and information concerning a prospective customer. She then joined Summit and asked at least one Anchor customer to switch its business to Summit.

6. This case is not an effort to prevent former employees from using their general skill, knowledge, training, or experience, and Anchor does not seek to bar lawful employment. It concerns specific information that belongs to Anchor, specific contractual promises, actual transfers and disclosures, and a coordinated effort to use Anchor's information and relationships as a shortcut to replicate Anchor's business.

7. Anchor therefore seeks temporary, preliminary, and permanent injunctive relief; return and sequestration of its information; enforcement of the applicable contractual restrictions; damages and disgorgement for misappropriation; the contractual remedies owed by Andrew Johnson; and all other relief allowed by law. Anchor is filing its request for temporary and preliminary relief in a separate motion as required by Local Rule CV-65.

## II.
## Parties

8. Plaintiff Anchor Graphics, Inc. is a Texas corporation with its headquarters at 4801 W. University Drive, Building B, Denton, Texas 76207. Anchor manufactures and sells labels, packaging, signs, decals, and related printed products to customers in Texas and throughout the United States.

9. Defendant Summit Graphics, LLC is a Texas limited liability company. Summit operates a competing labels, packaging, printing, and signs business at 224 W. Division Street, Pilot Point, Texas 76258. Summit may be served through its registered agent, Defendant Eric S. Brown, Jr. at 228 Sheila Avenue, Murphy, TX 75094, or wherever he may be found.

10. Defendant Eric S. Brown, Jr. is an individual who resides 228 Sheila Avenue Murphy, TX 75094. Brown formerly served as a Regional Vice President within JAL Equity Corp.'s corporate group, with operational responsibility for JAL's envelope companies. Brown was not responsible for Anchor's operations. Brown now holds himself out as Summit's Chief Financial Officer, uses a Summit email address, and, on information and belief, manages or directs Summit's operations.

11. Defendant Andrew Johnson is an individual who resides at 5680 Florida A1A, Apt 210, Vero Beach, Florida 32963. Johnson formerly served as Chief Operating Officer of JAL Equity Corp. and its subsidiaries and affiliates, including Anchor while Anchor was within that corporate group. Johnson now works for Summit.

12. Defendant Keidric Smith is an individual who resides at 2110 Orleander Way, McKinney, Texas 75071. Smith served as Anchor's Plant Manager until May 6, 2026 and now works for Summit.

13. Defendant Tammy Mitchell is an individual who resides at 15117 Fishtrap Road, Apt 1309, Aubrey, Texas 76227. Tammy Mitchell served as an Anchor Regional Sales Representative until July 2, 2026 and now works for Summit.

14. Defendant Benjamin Mercer is an individual who resides at 7008 Bishop Road, Apt 1304, Plano, Texas 75024. Mercer served as an Anchor Regional Sales Representative until June 26, 2026 and now works for Summit.

15. Defendant Christian Mitchell is an individual who resides at 5201 Springlake Pkwy, Apt 608, Haltom City, Texas 76117. Christian Mitchell served as Anchor's Shipping Supervisor until July 2, 2026 and now works for Summit.

16. Defendant Brandi Eversole is an individual who resides at 644 Crystal Brook Drive, Saginaw, Texas 76179. Smith served as general manager for NPC, LLC and now works for Summit.

## III.
## Jurisdiction and Venue

17. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Anchor asserts claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836(b), and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

18. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Anchor's related state-law claims because they form part of the same case or controversy as the federal claims.

19. Summit, Eric Brown, Keidric Smith, Tammy Mitchell, Benjamin Mercer, Christian Mitchell, and Brandi Eversole are subject to personal jurisdiction in Texas because they reside in Texas, conduct business in Texas, and committed the acts alleged in this Complaint in or directed toward Texas.

20. Johnson is subject to specific personal jurisdiction in Texas because he purposefully directed suit-related conduct toward Texas, participated in operating a Texas competing business, communicated through a Summit email account concerning the Texas operation, received and participated in communications using Anchor-derived information to advance Summit's Texas business, and acted in concert with Texas residents to cause injury to Anchor in Texas.

21. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Anchor's claims occurred in this District, Summit

operates in this District, Anchor is headquartered in this District, and the property and customer relationships affected by Defendants' conduct are centered in this District.

22. Denton County lies within the Sherman Division of the Eastern District of Texas. 28 U.S.C. § 124(c)(3).

## IV.
## Factual Allegations

### A. Anchor's Business and Protected Information

23. Anchor has operated in the label, print, packaging, sign, and specialty-decal industry for decades. Its customers include national and regional businesses whose orders, products, and communications move in interstate commerce.

24. Anchor's business is conducted largely on a purchase-order basis. A customer selecting Anchor for one order is not required to place its next order with Anchor. Each future order therefore remains subject to competition and can be diverted before Anchor learns that a competing quote was requested or accepted.

25. Anchor's protectable information includes several concrete categories of nonpublic information developed and maintained through its business operations (collectively, the "Trade Secrets").

26. First, the Trade Secrets include customer-specific product specifications, material requirements, quality requirements, purchasing preferences, product tolerances, approved constructions, order histories, pricing, and other information learned only through serving particular customers over time.

27. Second, the Trade Secrets include Anchor's internal costing and pricing methods, including material costs, production and labor assumptions, waste calculations, job-cost calculations, gross-margin analysis, target pricing, unit pricing, and the formulas and compilations through which Anchor turns those inputs into quotes.

28. Third, the Trade Secrets include Anchor's nonpublic selection and validation of particular vendor, material, adhesive, liner, and production-process combinations for particular customer applications, together with the vendor capabilities, purchase histories, and sourcing knowledge that make those combinations commercially useful.

29. Fourth, the Trade Secrets include customer and prospective-customer compilations, decision-maker and contact information, quote and bid information, artwork and print files, purchasing needs, sales histories, sales volumes, and information concerning new opportunities and monthly customer activity.

30. Fifth, the Trade Secrets include negative know-how: the nonpublic lessons Anchor learned from testing, trial and error, rejected products, failed materials, customer feedback, and prior production experience, including what does not work for particular customers or applications.

31. These categories are valuable not because each isolated fact is necessarily unknown in the industry, but because Anchor's customer-specific compilations and validated combinations allow a competitor to quote, source, and manufacture work without independently recreating Anchor's development process.

32. The Trade Secrets remain commercially useful today. A competitor can use them repeatedly to quote future purchase orders, target Anchor's customers, undercut Anchor's pricing, choose proven suppliers and materials, avoid failed approaches, and present itself as capable of servicing accounts it has not spent years developing.

33. Anchor has taken reasonable measures to protect this information. Access to customer specifications, pricing, order history, vendor information, production information, and related systems is limited by role and need to know. Company computers, systems, networks, and cloud accounts are password protected. Employees are prohibited from downloading, emailing, copying, exporting, retaining, using, or disclosing protected information except for authorized Company business.

34. Anchor does not ordinarily provide this information outside the Company. When information must be provided to a vendor, it is limited to what the vendor needs to know for the particular work. Anchor does not provide competitors with its customer-specific specifications, cost models, customer histories, validated vendor combinations, or negative know-how.

35. Some manufacturing knowledge exists in employees' memories, while other information exists in Anchor's Microsoft 365 environment, accounting and purchasing systems, email, electronic files, customer records, and production systems. The law and the governing contracts protect both tangible and intangible forms of the information.

36. Anchor does not claim ownership over the Individual Defendants' general skill, training, knowledge, or experience. The claims concern nonpublic Anchor information, specific customer and vendor relationships, and contractual obligations designed to protect those legitimate interests.

### B. The Protective Agreements and JAL's Assignment to Anchor

37. In April 2024, Anchor was a direct, wholly owned subsidiary of JAL Equity Corp. ("JAL"). At that time, JAL implemented a Texas Protective Agreement for employees within its corporate group.

38. Keidric Smith signed the Protective Agreement effective April 1, 2024.

39. Tammy Mitchell signed the Protective Agreement effective April 1, 2024.

40. Christian Mitchell signed the Protective Agreement effective April 1, 2024.

41. Brandi Eversole signed the Protective Agreement effective March 4, 2022.

42. Benjamin Mercer signed the Protective Agreement effective April 8, 2024.

43. Keidric Smith, Tammy Mitchell, Benjamin Mercer, Christian Mitchell, and Brandi Eversole are referred to collectively as the "Covenant Defendants."

44. Each Protective Agreement is between JAL and its affiliates, subsidiaries, successors, and assigns, defined individually and collectively as the "Company." Anchor was within that definition when the agreements were executed and when it employed the Covenant Defendants.

45. The Protective Agreements require the Covenant Defendants to hold protected information in strict confidence and prohibit them, during employment and for so long after employment as the information remains nonpublic, from using, transferring, disclosing, or assisting others in using or disclosing protected information for their own benefit, a third party's benefit, or the Company's detriment.

46. The agreements define protected information broadly and specifically to include production technologies and processes; equipment and product specifications; customer identities, needs, preferences, pricing, discounts, sales histories, product designs, specifications, purchase orders, and other customer-specific information; prospective-customer information; vendor identities, capabilities, pricing, and purchase histories; cost-calculation and pricing methods; growth and marketing strategies; financial data; and negative know-how.

47. For 365 days after employment, the agreements also prohibit the Covenant Defendants from soliciting, diverting, enticing away, or accepting business from covered customers and prospective customers with whom they had contact or about whom they had protected information. The agreements separately prohibit solicitation or inducement of Company employees with whom the Covenant Defendants worked.

48. The agreements require fourteen days' written notice before a voluntary departure, require the return or destruction of protected information and Company property upon separation, require notice to prospective employers, provide for reformation and tolling of the 365-day restrictions during any period of breach, recognize the availability of injunctive relief, and authorize reasonable attorneys' fees to the prevailing Company party.

49. The agreements expressly grant enforcement rights to intra-Company entities as third-party beneficiaries and authorize JAL to assign its rights without the employees' consent.

50. On December 3, 2024, JAL distributed Anchor's stock to JAL's sole owner, who then contributed the stock to Salu Group, Inc. d/b/a SG Capital. Anchor remained the same Texas corporation and retained its business, customer relationships, assets, and Trade Secrets.

51. Before filing this action, JAL executed a written assignment and ratification transferring to Anchor JAL's rights to enforce the Protective Agreements as they relate to Anchor, together with accrued claims, contractual remedies, and the right to seek injunctive and monetary relief. The assignment confirms and supplements Anchor's direct rights as an intended intra-Company beneficiary.

52. Andrew Johnson separately entered into a written Confidential Settlement Agreement with JAL on November 10, 2025 (the "Johnson Agreement"). JAL paid Johnson $100,000 under that agreement.

53. The Johnson Agreement prohibits Johnson from disclosing, communicating, or disseminating nonpublic, confidential, proprietary, business, financial, legal, or internal information concerning JAL and its business operations, management, ownership, customers, suppliers, employees, strategies, and other nonpublic business matters. It provides that a breach entitles JAL to return of the $100,000 payment and authorizes the prevailing party to recover reasonable attorneys' fees and costs.

54. JAL's pre-suit assignment to Anchor includes JAL's rights and accrued claims under the Johnson Agreement to the extent Johnson used or disclosed information relating to Anchor or acted to advance the competing enterprise alleged here.

### C. Eric Brown and Andrew Johnson Establish Summit at Anchor's Former Facility and Assemble Anchor's Workforce

55. Andrew Johnson served as JAL's Chief Operating Officer and had responsibility across JAL's subsidiaries and affiliates. Eric Brown served as a Regional Vice President responsible for JAL's envelope companies. Both knew the corporate group's confidentiality practices, the Protective Agreements, and the sensitivity of nonpublic customer, vendor, pricing, and production information.

56. Eric Brown's JAL employment ended on January 16, 2026. Johnson's JAL employment had ended on July 14, 2025.

57. Summit Graphics, LLC was formed in Texas in or around January 2026.

58. Anchor previously operated at 224 W. Division Street in Pilot Point, Texas. Anchor vacated that property on May 31, 2026 as part of its relocation to Denton.

59. Immediately after Anchor vacated the Pilot Point facility, a Summit-affiliated entity acquired the property and Summit began operating a competing labels, packaging, printing, and signs business from that same location.

60. Eric Smith's last day at Anchor was May 6, 2026. Mercer's last day was June 26, 2026. Tammy Mitchell's and Christian Mitchell's last day was July 2, 2026. None provided the fourteen days' advance written notice required by their Protective Agreements.

61. After leaving Anchor, Keidric Smith, Tammy Mitchell, Benjamin Mercer, and Christian Mitchell began working for Summit. Eric Brown, Keidric Smith, Benjamin Mercer, and Christian Mitchell used Summit email addresses in communications advancing Summit's quote efforts. Tammy Mitchell identified herself to an Anchor customer as a Summit representative.

62. The Covenant Defendants' agreements do not prohibit employment by a competitor. They do, however, prohibit the transfer, retention, use, and disclosure of Anchor's

protected information and restrict solicitation of the covered customers, prospective customers, and employees described in the agreements.

63. Eric Brown and Andrew Johnson knew or had reason to know those obligations. Brown and Johnson had held senior positions in the same corporate group, Eric Brown directed former Anchor employees to supply Anchor-derived information, and Summit accepted and used the resulting information to advance its business.

64. The timing, concentration of former Anchor personnel, location at Anchor's former facility, coordinated communications, and use of Anchor-derived information support the reasonable inference that Defendants shared a common objective to replicate Anchor's business and obtain its customers without independently developing the necessary information and relationships.

### D. Summit Uses Anchor-Derived Information to Obtain Quotes and Prepare to Service Anchor's Accounts

65. By March 2026, Brown and Johnson were already using Summit email accounts to pursue label and cling work through Husky Labels, an outside supplier that was not an Anchor customer.

66. On March 10, 2026, Eric Brown emailed Husky Labels and copied Andrew Johnson. Eric Brown stated that Summit had met with a customer the preceding day and sent a spreadsheet and specification sheets for fifteen labels and clings that Summit hoped to obtain. Eric Brown asked Husky Labels to provide quotes so Summit could "hit the ground running."

67. The next day, Husky Labels asked Eric Brown for the actual Excel file underlying a screenshot included in the communications. Eric Brown responded that he had sent separate emails containing "the files" and "the excel file."

68. In May 2026, Husky Labels again asked Eric Brown for the raw-material supplier and specification number for certain screen-protector products. The request remained part of the same "Top 15 Labels items to Quote" thread.

69. On July 28, 2026, Eric Brown forwarded the request to Keidric Smith and Christian Mitchell and asked them to provide the top label materials, the vendors, and vendor contact information needed by Husky Labels.

70. Keidric Smith responded from his Summit account with information expressly derived from Anchor. He identified Anchor's primary vendor for a product category, explained nonpublic requirements of three major Anchor customers, described what the vendor and an alternative supplier would and would not guarantee, disclosed production and quality requirements, explained why Anchor selected a particular production process, and supplied specific material constructions.

71. Smith's disclosure did not consist merely of general industry knowledge. It included customer-specific requirements, a confidential vendor relationship, a validated supplier/material/process combination, and negative know-how developed through Anchor's performance of the accounts.

72. Anchor learned those requirements and solutions over years of managing the customer relationships, testing products, receiving customer feedback, addressing rejected products, and refining production methods. A competitor would not ordinarily know the same combination without Anchor's information or without independently performing the same development work.

73. On August 13, 2026, Keidric Smith provided additional guidance concerning the materials, substitutions, and adhesive requirements Summit and Husky Labels should use. Eric Brown relayed and adopted the information in Summit's quote effort.

74. Benjamin Mercer and Christian Mitchell were included in the communications. Eric Brown expressly asked Christian Mitchell to help provide the vendor and material information. Benjamin Mercer received the disclosed information through his Summit email account and, on one message, through his still-monitored corporate account.

75. Andrew Johnson was included in the earlier spreadsheet and specification-sheet transmission. As Anchor's former group-wide Chief Operating Officer and a participant in Summit's operations, Andrew Johnson knew or had reason to know that the information being used to launch and quote Summit's competing work was nonpublic Company information subject to continuing confidentiality obligations.

76. Summit used the information to shorten the time and expense required to source materials, identify production methods, obtain supplier quotations, prepare customer quotations, and position itself to solicit and service accounts that Anchor had developed.

77. The email chain came to Anchor's attention only because a Summit participant mistakenly copied Benjamin Mercer's corporate Marketing.com address on an August 13 message. The mistake exposed a chain documenting Summit's ongoing use of Anchor-derived information from at least March through August 2026.

78. Neither Anchor nor JAL authorized any Defendant to provide Summit or Husky Labels with Anchor's customer requirements, vendor relationships, material selections, production methods, pricing information, specification sheets, or related protected information.

79. Each former employee who participated in or received the communications knew the source and confidential character of the information. Each had worked within the same corporate group, and Keidric Smith, Benjamin Mercer, and Christian Mitchell had recently worked at Anchor in roles giving them firsthand knowledge of Anchor's business and information controls.

### E. Tammy Mitchell Extracts Anchor's Pricing, Customer, and Prospect Information Immediately Before Joining Summit

80. Tammy Mitchell was a Regional Sales Representative. Her authorization to use Anchor's computer systems was limited by role and business need. She was not entitled to obtain every file, database, customer compilation, material-cost record, or production-cost assumption maintained within Anchor systems.

81. On June 29, 2026, three days before her employment ended, Tammy Mitchell used her Anchor email account to send customer and production materials to her personal iCloud account, including customer order information and print files.

82. On July 1, 2026, the day before her employment ended, Tammy Mitchell continued the extraction in a concentrated series of transfers to the same personal account.

83. At 8:37 a.m., she sent herself a Microsoft Excel workbook bearing the filename Anchor's Custom Label Quote.xlsx. The workbook is an internal costing and pricing tool, not a simple customer quote.

84. The workbook contains a cost model that calculates material waste, material consumption, extended material costs, labor costs, total job cost, profit, price per unit, price per thousand, gross margin, target price based on a desired margin, and margin based on a desired unit price.

85. A separate worksheet contains approximately one hundred material specifications and Anchor's corresponding cost information for label stock, films, liners, adhesives, reflective materials, aluminum, Coroplast, vinyl, and other production inputs.

86. Another worksheet contains production-time assumptions by quantity for hot-stamp, flexographic, and flatbed production. Together, the worksheets permit a user to recreate substantial portions of Anchor's quote-preparation process and pricing methodology without independently developing Anchor's cost structure.

87. Tammy Mitchell also transferred customer-specific artwork, proofs, order and production files, a customer price list, and other materials used to reproduce and quote customer work.

88. At 8:56 a.m., she used Microsoft 365 to share with her personal account a file identified as "NEW MONTHLY CUSTOMERS" and described as a commission sheet.

89. Later that day, she transferred an email identifying a potential new customer and the prospect's requested product specifications and quote requirements.

90. These transfers were directed to Tammy Mitchell's private iCloud account, outside Anchor's custody, control, access restrictions, retention policies, and security controls.

91. The timing and selection of the materials support the reasonable inference that Tammy Mitchell was assembling a portable package of Anchor pricing, cost, customer, prospect, and production information for use after her departure and for the benefit of Summit.

92. Some of the electronic repositories and information Tammy Mitchell accessed, including companywide material-cost and production-cost data and customer or prospect compilations outside her assigned accounts, were outside the areas and information she was entitled to obtain under the role-based access associated with her position.

93. Tammy Mitchell's access and transfers were intentional and were not undertaken to perform work for Anchor. Her actions occurred as she was preparing to leave Anchor for a competitor operating from Anchor's former facility.

94. On information and belief, Tammy Mitchell did not return or destroy all electronic copies of the information when her employment ended and continues to possess or control the information through her personal account, devices, or accounts accessible to her or Summit.

95. In early August 2026, an Anchor customer reported that Tammy Mitchell had contacted the customer, stated that she was with Summit, told the customer that the Pilot Point location had reopened, and asked the customer to switch its business to Summit.

96. The solicited customer was one Tammy Mitchell had contacted, serviced, developed, or managed during her final twelve months at Anchor or was a customer about which she possessed protected information within the scope of her agreement.

97. Summit accepted the benefit of Tammy Mitchell's customer knowledge and solicitation efforts. Her conduct is consistent with Summit's broader use of former Anchor employees and Anchor-derived information to target the same market and relationships.

**F. Defendants' Conduct Creates an Ongoing and Difficult-to-Quantify Threat**

98. Defendants' conduct is not limited to information remembered by former employees or to a single completed solicitation. Summit and the Individual Defendants have obtained, retained, transmitted, and used concrete Anchor files, cost models, customer and prospect information, vendor information, and customer-specific production knowledge.

99. Because Anchor's business is awarded purchase order by purchase order, Defendants can use the information repeatedly to pursue future orders without an immediate, visible termination of a long-term contract. A diverted quote or order may never be reported to Anchor.

100. The information remains current and commercially useful. It allows Summit to prepare competitive quotes, select proven materials and vendors, avoid failed approaches, and service customer requirements without the substantial time and expense Anchor invested to develop the same capabilities.

101. Some portions of the information cannot be recreated from public sources at all. Recreating the customer-specific knowledge would require entering long-term customer relationships, producing the work, receiving feedback, responding to quality issues and rejections, and learning through repeated performance.

102. Defendants' possession and use threaten Anchor's customer relationships, goodwill, pricing position, margins, competitive standing, and ability to recover its development investment. Those injuries are difficult to identify and quantify after the fact.

103. Anchor has already incurred and continues to incur expenses to investigate the scope of Defendants' access, transfers, possession, and use; preserve evidence; assess the affected systems and information; and respond to the security incident. The conduct involves qualifying CFAA loss aggregating at least $5,000 during a one-year period, including reasonable costs of responding to the offense and conducting a damage and forensic assessment.

104. Defendants acted knowingly and, on information and belief, willfully and maliciously. The Covenant Defendants signed agreements identifying the protected categories and prohibiting the precise conduct at issue. Brown and Johnson knew those obligations from their executive roles. Summit nevertheless requested, received, and used the information for competitive purposes.

105. Without injunctive relief, Defendants can continue using the information to quote and obtain future orders, disseminate it to suppliers and other third parties, solicit covered customers and prospective customers, and further erode Anchor's goodwill and competitive position.

## V.
## CAUSES OF ACTION

### Count I – Misappropriation of Trade Secrets Under the Defend Trade Secrets Act
### 18 U.S.C. § 1836
### *(Against All Defendants)*

106. Anchor incorporates the preceding paragraphs as though fully set forth here.

107. Anchor owns the Trade Secrets described above, including customer-specific specifications and preferences, internal pricing and cost information, vendor and material combinations, customer and prospective-customer compilations, and negative know-how.

108. The Trade Secrets relate to products and services used in or intended for use in interstate commerce. Anchor serves customers throughout the United States, and Defendants used the information in interstate email communications and supplier-quote efforts.

109. Anchor has taken reasonable measures to maintain the secrecy of the Trade Secrets, including role-based and need-to-know access, password-protected systems, contractual confidentiality and return obligations, restricted external disclosure, and limited vendor disclosure.

110. Smith misappropriated the Trade Secrets by disclosing and using Anchor's customer requirements, vendor information, material selections, production methods, and negative know-how for Summit's benefit after his employment ended and in breach of his duty to maintain secrecy and limit use.

111. Tammy Mitchell misappropriated the Trade Secrets by improperly acquiring, transferring, retaining, and using Anchor's internal pricing and cost model, material-cost database, production assumptions, customer and prospect information, artwork and production files, pricing information, and customer-activity data in breach of her confidentiality, return, and use restrictions.

112. Brown misappropriated the Trade Secrets by requesting and acquiring the information from former Anchor employees, directing its disclosure to Summit and Husky Labels, using it to obtain supplier quotes and prepare Summit's competing business, and continuing to possess and use it with knowledge of its source and protected character.

113. Johnson misappropriated the Trade Secrets by participating in Summit's operations, receiving and using spreadsheets, specification sheets, and other Anchor-derived information for Summit's benefit, and assisting the competing enterprise with knowledge of Anchor's rights and the former employees' continuing obligations.

114. Mercer and Christian Mitchell misappropriated the Trade Secrets by acquiring, receiving, retaining, and using the Anchor-derived information circulated within Summit, despite

knowing or having reason to know that it came from Anchor and was disclosed or retained in breach of continuing duties of secrecy and limited use.

115. Summit misappropriated the Trade Secrets by acquiring them through former Anchor employees and executives, using and disclosing them to develop supplier relationships, obtain quotes, solicit or prepare to solicit Anchor customers, reproduce Anchor's products and processes, and compete without independently developing the same information.

116. Each Defendant knew or had reason to know that the information was acquired through improper means or derived from persons who owed duties to Anchor or JAL to maintain its secrecy and limit its use.

117. Defendants' misappropriation is actual and threatened, willful, and malicious. Anchor is entitled to recover its actual loss, Defendants' unjust enrichment not included in actual loss, or a reasonable royalty; enhanced damages; reasonable attorneys' fees; costs; and appropriate injunctive relief under 18 U.S.C. § 1836(b)(3).

**Count II – Misappropriation of Trade Secrets Under the Texas Uniform Trade Secrets Act**
**Tex. Civ. Prac. & Rem. Code § 134A.001 et seq.**
***(Against All Defendants)***

118. Anchor incorporates the preceding paragraphs as though fully set forth here.

119. The information described above constitutes trade secrets under the Texas Uniform Trade Secrets Act because it derives independent economic value from not being generally known or readily ascertainable by proper means and because Anchor has taken reasonable measures under the circumstances to maintain its secrecy.

120. Defendants acquired, disclosed, and used the Trade Secrets through improper means and without Anchor's consent, including through breaches and inducement of breaches of duties to maintain secrecy and limit use.

121. The defendant-specific acts described in Count I also constitute actual and threatened misappropriation under Chapter 134A.

122. Defendants' conduct was willful and malicious. Anchor is entitled to injunctive relief, actual-loss and unjust-enrichment damages or a reasonable royalty, exemplary damages, reasonable attorneys' fees, and all other relief authorized by Tex. Civ. Prac. & Rem. Code §§ 134A.003-.005.

**Count III – Violation of the Computer Fraud and Abuse Act**
**18 U.S.C. § 1030(a)(2)(C)**
***(Against Tammy Mitchell)***

123. Anchor incorporates the preceding paragraphs as though fully set forth here.

124. Anchor and its affiliated corporate group maintained Microsoft 365, networked computers, email systems, electronic file repositories, and related computer systems used in and affecting interstate commerce and communication. Those systems and computers are protected computers within the meaning of 18 U.S.C. § 1030(e)(2).

125. Access to the systems and information was limited by role and business need. Tammy Mitchell was authorized to access only the systems, files, folders, repositories, and information she was entitled to obtain for her work as an Anchor Regional Sales Representative.

126. Tammy Mitchell was not entitled to obtain companywide material-cost and production-cost information, internal pricing formulas, customer and prospective-customer compilations outside the scope of her assigned responsibilities, or other information maintained in portions of the systems beyond her role-based access entitlement.

127. On information and belief, Tammy Mitchell intentionally used her authorized computer access to enter or retrieve information from such portions of the systems and obtain information she was not entitled to obtain, including the internal costing workbook, material-cost data, production assumptions, customer and prospect compilations, and related files.

128. Tammy Mitchell then transferred the information to her personal iCloud account in the final days of her employment, thereby obtaining information from protected computers while exceeding her authorized access within the meaning of 18 U.S.C. §§ 1030(a)(2)(C) and 1030(e)(6).

129. In the alternative, to the extent Tammy Mitchell accessed any Anchor computer, account, repository, or file after her authorization ended, that access was without authorization.

130. Her access was intentional and undertaken to obtain Anchor information for her own benefit and the benefit of Summit, not accidentally or for the performance of authorized Anchor work.

131. By reason of the violation, Anchor suffered and continues to suffer damage or loss within the meaning of 18 U.S.C. §§ 1030(e)(8), 1030(e)(11), and 1030(g). The conduct involved loss aggregating at least $5,000 during a one-year period, including reasonable costs to respond to the offense and conduct a damage and forensic assessment.

132. Anchor is entitled to compensatory damages and equitable and injunctive relief under 18 U.S.C. § 1030(g).

**Count IV – Breach of the Protective Agreements**
***(Against Keidric Smith, Tammy Mitchell, Benjamin Mercer, Christian Mitchell and Brandi Eversole)***

133. Anchor incorporates the preceding paragraphs as though fully set forth here.

134. The Protective Agreements are valid and enforceable written contracts supported by employment, continued employment, access to protected information, customer relationships, and employee relationships. Each Covenant Defendant signed an agreement, and the Company accepted and performed its promises.

135. Anchor has the right to enforce the agreements as an intended intra-Company beneficiary and as JAL's assignee. Anchor performed or was excused from performing all conditions and obligations required of it.

136. Keidric Smith breached his agreement by failing to provide the required departure notice; using and disclosing protected customer, vendor, material, production, and negative-know-how information for Summit's benefit; assisting Summit's solicitation and quote efforts; and failing to return or cease using protected information.

137. Tammy Mitchell breached her agreement by failing to provide the required departure notice; transferring and retaining protected information in her personal account; using or preparing to use the information for Summit; failing to return or destroy the information; and soliciting a covered Anchor customer to redirect business to Summit.

138. Benjamin Mercer breached his agreement by failing to provide the required departure notice and, on information and belief, acquiring, retaining, using, or assisting Summit in using Anchor's protected customer, vendor, material, quote, and production information after his employment ended.

139. Christian Mitchell breached his agreement by failing to provide the required departure notice and, on information and belief, acquiring, retaining, using, disclosing, or assisting Summit in using Anchor's protected vendor, material, customer, and production information after his employment ended.

140. Brandi Eversole breached her agreement by failing to provide the required departure notice and, on information and belief, acquiring, retaining, using, disclosing, or assisting Summit in using Anchor's protected vendor, material, customer, and production information after his employment ended.

141. The Covenant Defendants' breaches have caused and threaten damages, loss of the benefit of Anchor's contractual protections, investigative and remedial costs, loss of goodwill and competitive advantage, and diversion of customer opportunities. The full amount will be proven at trial.

142. Anchor is entitled to damages, specific performance, temporary and permanent injunctive relief, tolling of the 365-day restrictions for periods of breach, reasonable attorneys' fees and costs, and all other contractual and legal remedies.

**Count V – Tortious Interference with Existing Contracts**
***(Against Summit, Eric Brown, and Andrew Johnson)***

143. Anchor incorporates the preceding paragraphs as though fully set forth here.

144. The Protective Agreements are valid contracts between JAL, its covered entities, and the Covenant Defendants. Anchor holds direct third-party-beneficiary and assigned enforcement rights.

145. Summit, Eric Brown, and Andrew Johnson knew of the Protective Agreements and their material obligations. Eric Brown and Andrew Johnson knew the agreements from their executive roles, and Summit acted through Eric Brown, Andrew Johnson, and the Covenant Defendants.

146. Summit, Eric Brown, and Andrew Johnson willfully and intentionally interfered with the agreements by requesting, encouraging, accepting, and using protected information; directing the Covenant Defendants to provide vendors, materials, customer requirements, and production information; accepting the benefit of Tammy Mitchell's customer solicitation; facilitating the retention and use of Anchor information; and enabling ongoing breaches from Summit's Pilot Point operation.

147. Their interference caused actual breaches and made performance of the Covenant Defendants' confidentiality, return, notice, customer, prospective-customer, and employee obligations more burdensome and less effective.

148. This claim is based on contractual duties independent of and broader than statutory trade-secret duties, including customer and employee nonsolicitation, advance notice, return and destruction of Company property, notice to prospective employers, and confidentiality obligations applicable even to protected information not ultimately adjudged to be a statutory trade secret.

149. The interference was independently tortious, unlawful, unjustified, and accomplished through improper means. It proximately caused injury to Anchor, including loss of

the benefit of its contracts, investigative and remedial costs, harm to customer relationships and goodwill, and threatened or actual diversion of business opportunities.

150. Anchor is entitled to actual and exemplary damages, injunctive relief, costs, and all other relief allowed by law.

**Count VI – Breah of the Confidentiality Settlement Agreement**
***(Against Andrew Johnson)***

151. Anchor incorporates the preceding paragraphs as though fully set forth here.

152. Andrew Johnson's Confidentiality Settlement Agreement is a valid written contract. JAL performed by paying Johnson $100,000, and JAL assigned to Anchor the relevant contractual rights and accrued claims before this action was filed.

153. The Confidentiality Settlement Agreement required Johnson not to disclose, communicate, or disseminate nonpublic information relating to JAL, including its business operations, management, customers, suppliers, employees, strategies, financial condition, and other internal business matters.

154. On information and belief, Johnson breached the Confidentiality Settlement Agreement by using, communicating, disseminating, or assisting Summit in using nonpublic information he learned through his JAL executive role, including information concerning JAL's management of Anchor, Anchor's operations and personnel while it was a JAL subsidiary, and customer, supplier, and business strategies known to JAL, to establish and advance Summit's competing operation.

155. The breach entitles Anchor, as assignee, to recover the $100,000 contractual payment, reasonable attorneys' fees and costs, damages caused by the breach, and all other remedies available under the agreement and applicable law.

**Count VII – Civil Conspiracy**
***(Against All Defendants)***

156. Anchor incorporates the preceding paragraphs as though fully set forth here.

157. Defendants combined and shared a common objective to establish and advance Summit by obtaining and using Anchor's workforce, protected information, customer relationships, vendor relationships, production knowledge, and pricing advantages without independently developing them and notwithstanding the governing contractual obligations.

158. A meeting of the minds may be inferred from the coordinated timing of the competing operation, the concentration of former Anchor personnel at the same facility, the shared Summit communications, Brown's requests for Anchor-derived information, Smith's disclosures, Mercer and Christian Mitchell's participation, Tammy Mitchell's pre-departure extraction and subsequent customer solicitation, Johnson's participation, and Summit's acceptance and use of the benefits.

159. Defendants committed overt unlawful acts in furtherance of the common design, including tortious interference with the Protective Agreements, acquisition and use of protected information, customer solicitation in violation of contract, retention of Company property, and coordinated dissemination to suppliers and other participants.

160. To the extent required to avoid displacement under TUTSA, this claim is pleaded in the alternative and rests on the conspiracy to tortiously interfere with independent contractual duties and to acquire or use confidential and proprietary information, customer goodwill, and contractual rights that may not ultimately be adjudged statutory trade secrets.

161. The conspiracy proximately caused the injuries alleged above. Defendants are jointly responsible for the damages caused by the unlawful acts committed in furtherance of the conspiracy.

## VI.
## Entitlement to Permanent Injunctive Relief

162. Anchor has pleaded viable causes of action and is entitled to permanent injunctive relief because Defendants' actual and threatened misconduct will cause continuing injury for which

damages alone are inadequate. The information can be used repeatedly, the purchase-order business model makes diversion difficult to detect, and loss of customer goodwill, pricing position, and competitive advantage cannot be fully measured after the fact.

163. Anchor seeks a narrowly tailored injunction that does not prohibit lawful competition or use of general skill and experience, but that: (a) prohibits Defendants from accessing, using, disclosing, transmitting, copying, or assisting others in using Anchor's Trade Secrets and contractually protected information; (b) requires preservation, identification, sequestration, return, and controlled remediation of all Anchor information and copies; (c) enforces the Covenant Defendants' customer, prospective-customer, employee, return, and confidentiality obligations for the applicable and contractually tolled periods; and (d) prohibits Summit, Brown, and Johnson from inducing or assisting further breaches.

## VII.
## Conditions Precedent

164. All conditions precedent to Anchor's claims for relief have occurred, have been performed, or have been waived or excused.

## VIII.
## Jury Demand

165. Anchor demands a trial by jury on all issues so triable.

## IX.
## Prayer

For these reasons, Plaintiff Anchor Graphics, Inc. respectfully requests that, after all proceedings, the Court enter judgment in Anchor's favor and award the following relief:

a. Temporary, preliminary, and permanent injunctive relief as requested in this Complaint and Anchor's separately filed Rule 65 motion;

b. A declaration and judgment that Defendants misappropriated Anchor's trade secrets in violation of DTSA and TUTSA;

c. Anchor's actual losses and Defendants' unjust enrichment caused by the misappropriation, or a reasonable royalty where authorized;

d. Exemplary or enhanced damages for willful and malicious misappropriation under DTSA and TUTSA;

e. Compensatory damages and equitable relief under the CFAA;

f. Damages for breach of the Protective Agreements, specific performance, contractual tolling of the 365-day restrictions, and the other remedies provided by those agreements;

g. Damages for tortious interference and civil conspiracy, including exemplary damages where permitted;

h. Return of the $100,000 Johnson Agreement payment and all other damages and contractual remedies arising from Johnson's breach;

i. An accounting, disgorgement, and constructive trust or other equitable relief as appropriate over profits and benefits attributable to Defendants' unlawful conduct;

j. An order requiring Defendants to identify every person, device, account, repository, and location to which Anchor information was transferred; preserve all relevant evidence; and return or sequester Anchor information through a controlled process that preserves evidentiary integrity;

k. Reasonable and necessary attorneys' fees and costs under DTSA, TUTSA, the Protective Agreements, the Johnson Agreement, and all other applicable law;

l. Prejudgment and postjudgment interest at the maximum lawful rates;

m. Court costs; and

n. All other legal and equitable relief to which Anchor may be entitled.

Respectfully submitted,

/s/ Deondrey Rashad Russell
A. Boone Almanza, Bar No. 01579001
balmanza@abdmlaw.com
Deondrey Rashad Russell, Bar No. 24140554
drussell@abdmlaw.com
ALMANZA, BLACKBURN, DICKIE & MITCHELL, LLP
2301 S. Capital of Texas Highway, Building H
Austin, Texas 78746
(512) 474-9486 (tel) | (512) 478-7151 (fax)

*Attorney for Plaintiff Anchor Graphics, Inc.*