UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| ANCHOR GRAPHICS, INC. | § | |
| | § | |
| v. | § | CIVIL NO. 4:26-CV-1143-SDJ |
| | § | |
| SUMMIT GRAPHICS, LLC, ET AL. | § | |

**MEMORANDUM OPINION AND ORDER**

In this trade secrets case, Plaintiff Anchor Graphics, Inc. ("Anchor") sued Defendants Summit Graphics, LLC ("Summit"), Eric S. Brown, Jr., Andrew Johnson, Keidric Smith, Tammy Mitchell, Benjamin Mercer, and Christian Mitchell[1] for misappropriation of trade secrets under the Defend Trade Secrets Act and the Texas Uniform Trade Secrets Act. (Dkt. #1). In addition, Anchor asserts that Smith, Tammy Mitchell, Mercer, and Christian Mitchell (collectively, the "Covenant Defendants"), who are former employees of Anchor, violated signed Protective Agreements that prohibited them from disseminating Anchor's trade secrets and other confidential or proprietary information. (Dkt. #1); *see also* (Dkt. #4-2) (Protective Agreements).

Anchor has filed its "Emergency Motion for Temporary Restraining Order and Preliminary Injunction." (Dkt. #4). Defendants responded, (Dkt. #20), and the Court held a hearing on the TRO request, (Dkt. #24). The TRO will be denied and a hearing has been set on Anchor's request for preliminary injunction.

[1] Anchor also initially sued Brandi Eversole. (Dkt. #1). But she has since been dismissed. (Dkt. #17).

## I. LEGAL STANDARD

The standard for obtaining a temporary restraining order is the same as that for obtaining a preliminary injunction. *See Bowling v. Dahlheimer*, No. 4:18-CV-00610-ALM-CAN, 2018 WL 6582826, at *1 (E.D. Tex. Oct. 3, 2018). Indeed, a TRO has been aptly described as "simply a highly accelerated and temporary form of preliminary injunctive relief." *Lee v. Verizon Commc'ns, Inc.*, 2012 WL 6089041, at *1 n.2 (N.D. Tex. Dec. 7, 2012). The movant must establish four elements to obtain a TRO:

> (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the [temporary restraining order] is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the [temporary restraining order] may do to defendant, and (4) that granting the [temporary restraining order] will not disserve the public interest.

*Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009) (quoting *Canal Auth. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974)). The likelihood of success on the merits factor is the most important. *Jackson v. Tarrant Cnty, Tex.*, 158 F.4th 571, 581 (5th Cir. 2025) (quotation omitted).

A TRO is an "extraordinary and drastic remedy" that "should only be granted when the movant has clearly carried the burden of persuasion." *Anderson*, 556 F.3d at 360 (quotation omitted). If a court concludes that the movant has not satisfied even one of the four essential requirements for a TRO, "the court need not address the remaining three factors." *Lee*, 2012 WL 6089041, at *6.

## II. DISCUSSION

As described in its written motion, Anchor's request for a temporary restraining order turns on two theories. First, as to all Defendants, the alleged

misappropriation of Anchor's trade secrets justifies a TRO. Second, as to the Covenant Defendants, a TRO is also warranted by these Defendants' alleged breaches of their Protective Agreements with Anchor. (Dkt. #4).[2] More broadly, Anchor asserts it is entitled to both preliminary and permanent injunctive relief against Defendants and requests that this Court issue a TRO, a preliminary injunction, and ultimately a permanent injunction restraining Defendants from further misappropriating its trade secrets and breaching the Protective Agreements.

But Anchor's position changed at the hearing, at least as to its TRO request. Although Anchor argued in its motion that it was entitled to a TRO on both its trade secrets and contract theories, (Dkt. #4), it conceded at the hearing, on the record and in open court, that it could not, at that time, specify the trade secrets at issue with sufficient particularity for temporary injunctive relief. Accordingly, Anchor expressly abandoned its trade secrets theory for the purpose of obtaining a TRO. Its only remaining theory in support of a TRO is its claim for breaches of the Protective Agreement, a theory which applies only to the Covenant Defendants—not Summit, Johnson, or Brown. *See supra* n.2. Thus, Anchor has abandoned its request for a TRO against Defendants Summit, Johnson, and Brown. Further, due to Anchor's self-admitted failure to identify trade secrets at this juncture, the only basis for a TRO on

---

[2] Though Anchor's briefing does not explicitly confine its contract theory to just the Covenant Defendants, Anchor does not assert or otherwise provide evidence that Summit is a party to any of the Protective Agreements. Further, Anchor alleges Defendant Johnson signed a Confidential Settlement Agreement. (Dkt. #1 ¶ 52). However, Anchor neither attaches that agreement, nor does it mention the agreement in its motion. *See* (Dkt. #4). Similarly, Anchor fails to allege Defendant Brown signed any agreement obliging him to protect Anchor's information. *See* (Dkt. #1, #4). Therefore, Anchor's contract theory can bind only the Covenant Defendants—not Summit, Johnson, or Brown.

its Protective-Agreement claims against the Covenant Defendants could be the dissemination of confidential information—not trade secrets.

The record before the Court demonstrates that there is no "emergency" here and no grounds for "urgent" injunctive relief. Indeed, Anchor's filings candidly admit that it has not identified *any business* that it has lost, or any other impact whatsoever on its operations, due to Defendants' alleged acts. Likewise, Anchor has not shown a substantial likelihood that it will prevail on the merits or a substantial threat that it will suffer irreparable injury if a TRO is not granted. For these reasons, the TRO will be denied.

**A. Applicable Law**

As a preliminary matter, the Court must first determine what substantive law applies to the Protective Agreements. A court sitting in diversity applies the forum's choice-of-law rules to determine what substantive law should apply to the state-law claims. *Parmer v. Entrust Corp.*, No. 4:23-CV-00667, 2024 WL 1889241, at *4 (E.D. Tex. Apr. 29, 2024) (quoting *Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 770–71 (5th Cir. 2016)). This action was brought in a Texas federal court, so Texas choice-of-law rules apply. *Id.*

Texas follows the Restatement (Second) of Conflict of Laws. *Weber*, 811 F.3d at 771 (citing *Maxus Exploration Co. v. Moran Bros.*, 817 S.W.2d 50, 53 (Tex.1991)). Texas courts generally enforce choice-of-law provisions in a contract. *Parmer*, 2024 WL 1889241, at *4. But here, the Protective Agreements do not contain any choice-of-law provisions. *See* (Dkt. #4-2). The parties assume that the Protective Agreements

should be enforced according to Texas law. *See* (Dkt. #4, #20) (providing no analysis on the law to be applied to the Protective Agreements).

The Restatement instructs that in the absence of a choice-of-law provision, the court determines the applicable law by considering: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties." Restatement (Second) of Conflict Laws § 188(2) (paragraph breaks altered); *see also Allied Van Lines, Inc. v. Aaron Transfer & Storage, Inc.*, No. 402CV497Y, 2003 WL 22056220, at *4 (N.D. Tex. Sept. 3, 2003) (noting Restatement § 188 applies to contract disputes with no choice-of-law provision).

Here, almost all the parties to this lawsuit reside in Texas.[3] (Dkt. #1 at 3–4). At all relevant times, Anchor has conducted its business in Denton, Texas, and Summit now conducts its business from Anchor's former location. (Dkt. #1 at 11). Given these undisputed facts, the Court can reasonably presume that the place of contracting, place of performance, and the location of the subject matter of the Protective Agreements are also all in Texas. There is no evidence before the Court contradicting that Texas is the lex loci of the Protective Agreements, and the parties themselves assume Texas law applies. Thus, the Court concludes that Texas law applies to the Protective Agreements.

[3] Only Defendant Johnson resides outside of Texas. (Dkt. #1 ¶ 11).

**B. Temporary Restraining Order**

Anchor asserts breach-of-contract claims against the Covenant Defendants. (Dkt. #1 at 22). Breach-of-contract claims in Texas require the existence of a valid contract. *Gaspar v. Lawnpro, Inc.*, 372 S.W.3d 754, 757 (Tex. App—Dallas, no pet.) (citation omitted). A valid contract requires offer, acceptance, and consideration. *Burges v. Mosley*, 304 S.W.3d 623, 629 (Tex. App.—Tyler 2010, no pet.) (citation omitted). Here, there are several issues that cast doubt on whether the Protective Agreements are valid contracts.

First, the Protective Agreements were entered into between JAL Equity Corp. ("JAL"), "its affiliates, subsidiaries, successors, and assigns," and each of the Covenant Defendants. (Dkt. #4-2). JAL is not a party to this lawsuit. Anchor alleges that JAL assigned the Protective Agreements to Anchor. (Dkt. #1 at 8.). It also alleges that, regardless of any assignment, it was an affiliate of JAL at the time the Protective Agreements were executed. (Dkt. #1 at 8). However, Anchor has not provided the assignments or supplied any evidence that it is an affiliate. Anchor only provides the declaration of Ian Barber[4] to support those assertions, but his declaration attached no supporting documentation corroborating that Anchor is a party to the Protective Agreements. (Dkt. 4-1 ¶ 17). Accordingly, the Court cannot conclude that Anchor can enforce the Protective Agreements. *See IP Petroleum Co. v. Wevanco Energy, L.L.C.*, 116 S.W.3d 888, 898 (Tex. App.—Houston [1st Dist.] 2003,

[4] Barber is the General Counsel of Salu Group, Inc. d/b/a SG Capital, Anchor's parent company. (Dkt. #4-1 ¶ 2).

pet. denied) (citing *Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex. 2002)) ("[A] plaintiff may not enforce a contract to which he is not a party.").

The parties also dispute the formation of the Protective Agreements because the Covenant Defendants aver that they never signed them or that there is no evidence that they signed them. (Dkt. #20-1). Indeed, the Covenant Defendants have submitted declarations stating that they do not remember receiving the Protective Agreements, and some dispute that the signatures resemble their own. (Dkt. #20-1). For its part, Anchor maintains that it presented each Covenant Defendant with the Protective Agreements and that their signatures are genuine. (Dkt. #4). But at this stage, the Court cannot positively determine whether the Covenant Defendants assented to the agreements—a critical determination before the enforcement of any contract.

Next, Anchor has failed to present any evidence that the Protective Agreements were supported by consideration. Texas law requires that these types of employment agreements be "ancillary to or part of" an otherwise enforceable agreement. *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 773 (Tex. 2011) (quotation omitted). Here, the Protective Agreements were executed in March or April 2024. (Dkt. #4-2). Each Covenant Defendant was already an employee of Anchor at that time.[5] (Dkt. #1 at 8). Thus, the Protective Agreements are separate agreements requiring independent consideration.

[5] At the hearing, there was a question of whether one of the Covenant Defendants signed the Protective Agreement at or near the time of their start date. At this time, there is no evidence that any Covenant Defendant signed a Protective Agreement contemporaneously

The Protective Agreements state that the Covenant Defendants were to protect JAL or its affiliates' "Protected Information," as that term is defined, in exchange for "employment or continued employment" and access to the Protected Information, new customers, and team members. (Dkt. #4-2). The Covenant Defendants were already employees, so the consideration offered was "continued employment" or access to Protected Information, new customers, and team members. But continued employment is insufficient consideration for the Protective Agreements under Texas law. *See Weber Aircraft, L.L.C. v. Krishnamurthy*, No. 4:12-CV-666, 2014 WL 12521297, at *4 (E.D. Tex. Jan. 27, 2014) (citing *Light v. Centel Cellular Co. of Tex.*, 883 S.W.2d 642, 645 n.5 (Tex. 1994)) (explaining that "continued employment is not sufficient consideration" for an agreement with an existing employee). As far as access to Protected Information, new customers, and team members, there is no evidence before the Court indicating the Covenant Defendants received access to any Protected Information, new customers, or team members beyond what they could already access. Accordingly, the Court cannot determine whether the Protective Agreements were supported by valid consideration.

Finally, Anchor has not identified what Protected Information the Covenant Defendants allegedly possess and have not protected. Anchor has submitted several documents to the Court that it contends the Covenant Defendants have in their possession. *See* (Dkt. #4-4). However, the Court is not convinced most of these documents are confidential.

---

with the start of their employment. Regardless, such evidence would not affect the Court's ultimate conclusion.

In this regard, in its written submissions, Anchor attached copies of sales orders as examples of "trade secret" or "confidential" material allegedly misappropriated by at least one Defendant. (Dkt. #4-4 at 2–3). But there is no evidence that such documents are even confidential. To the contrary, the Court presumes that sales orders sent to clients, and potentially to other third parties, are not confidential. Anchor similarly styled an Industrial Catalogue, which appears to have been publicly distributed sales and marketing material affixed with QR codes, as "trade secret" or "confidential" material. (Dkt. #4-4 at 16–35). At the TRO hearing Anchor retreated from its written submissions and conceded that it could not state with certainty whether the "trade secret" or "confidential" material in the relevant exhibits submitted to the Court were distributed to third parties, such as customers, or to the public at large. Anchor's failure to identify with certainty any confidential or proprietary information purportedly appropriated by any Defendant provides an additional reason for the Court's conclusion that Anchor is unlikely to succeed on the merits of its breach-of-contract claim concerning the Protective Agreements.[6]

---

[6] Barber's declaration referred to Exhibit 5, which Anchor did not attach with its initial filing. (Dkt. #4-1 ¶ 55). This exhibit referred to an Excel workbook entitled "Anchor's Custom Label Quote.xlsx." (Dkt. #4-1 ¶¶ 54–55). At the hearing, Anchor's counsel acknowledged that he inadvertently left Exhibit 5 off the filing and distributed copies to the Court and Defendants' counsel, with no objection. Anchor later filed Exhibit 5 under seal. (Dkt. #25).

After reviewing Exhibit 5, the Court still concludes Anchor has failed to identify with certainty any confidential or proprietary information appropriated by Defendants. Barber's declaration established that Exhibit 5 is an "internal costing and pricing model." (Dkt. #4-1 ¶ 56). An internal document is not necessarily a confidential one. And though a company could reasonably consider a costing and pricing model to be confidential, Anchor and Barber never directly asserted that this particular document was confidential. *See* (Dkt. #4, #4-1). Anchor's attempt to file Exhibit 5 under seal likewise does not transform this document into a confidential one. Further, the Court makes no determination as to whether Exhibit 5 is a trade secret. Anchor did not directly argue that Exhibit 5 meets the criteria for a trade secret,

Even if Anchor could establish a likelihood of success on the merits, it also has not "clearly carried the burden" of establishing that it will face irreparable injury if the TRO is not granted. An injury is generally considered irreparable if it cannot be undone through monetary damages. *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981). The injury must also be imminent and not speculative. *See Hurley v. Gunnels*, 41 F.3d 662, 1994 WL 684658, at *1 (5th Cir. 1994) (per curiam) (unpublished table decision) (citing *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)).

Anchor argues it faces a threat of irreparable injury because Defendants can use its Protected Information to steal away customers and erode its goodwill. (Dkt. #4 at 10). Leaving aside Anchor's failure to identify with certainty any such "Protected Information," Anchor also has presented no evidence that Defendants' alleged acts have caused Anchor to lose even one purchase order, or that Defendants have somehow otherwise negatively impacted Anchor's operations. As Mr. Barber, the general counsel for Anchor's parent company, admits in his declaration: "Anchor has not yet identified a specific customer that has terminated its relationship with Anchor because of Summit, a specific purchase order that Anchor can presently prove was lost to Summit, or a specific quote that Anchor was forced to reduce because of Summit." (Dkt. #4-1 ¶ 68). Anchor further admits it operates by "purchase order to purchase order," and that past business with a customer does not guarantee future business. (Dkt. #4 at 3). So, in part through its own admissions, Anchor has failed to

and as the Court has already noted, Anchor abandoned its trade secret theory for the purpose of obtaining a TRO.

show that Defendants have caused it to lose any business, or that Defendants actions have resulted in lost goodwill among Anchor's clients.[7] Absent such evidence, Anchor has failed to demonstrate any threat of irreparable injury.

Anchor's TRO request fails because it has not carried its burden on at least two of the TRO factors. It has failed to clearly establish the most important factor—that it has a likelihood of succeeding on the merits of its claims. *Jackson,* 158 F.4th at 581. Anchor has also failed to establish that it faces irreparable harm if a TRO is not granted. Because Anchor has not satisfied two of the four essential requirements for a TRO, "the court need not address the remaining [two] factors." *Lee*, 2012 WL 6089041, at *6.

* * * *

Federal Rule of Civil Procedure 65 is arguably the most abused procedural device, exemplified by the all-too-frequent "emergency" motion for TRO. In many cases the record demonstrates that nothing remotely approaching an "emergency" exists, and the movant cannot meet the requirements for preliminary injunctive relief, much less show that urgent action by the Court is required. The result is that the Court's limited resources are diverted unnecessarily from matters that are more pressing. Unfortunately, this case presents just such an example of an abuse of the Court's time and resources.

[7] At the hearing, Anchor attempted to introduce a document purporting to be an email showing it lost business from a specific customer due to Defendants' acts. However, Defendants objected to the introduction of this evidence, and the Court sustained the objection. Thus, the Court does not consider the evidence here. Anchor may attempt to introduce this evidence or any other evidence potentially showing harm in future filings.

## III. CONCLUSION

It is **ORDERED** that Plaintiffs' Emergency Motion for Temporary Restraining Order and Preliminary Injunction, (Dkt. #4), is **DENIED** to the extent it requests a TRO. Anchor's request for a preliminary injunction remains pending and has been set for hearing. (Dkt. #26).

**So ORDERED and SIGNED this 18th day of September, 2026.**

SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE